REQUESTED BY: Sen. Chris Beutler Nebraska State Legislature
From 1948 to 1994, much of world trade was governed by the international General Agreement on Tariffs and Trade ("GATT"), to which the United States was a party. Initially, GATT did not pertain to government procurement. However, in 1979, an Agreement on Government Procurement ("GPA") was signed under GATT, and that agreement became effective in 1981. The first GPA was subsequently amended in 1987, and again in 1994, at the same time that the agreement establishing the World Trade Organization ("WTO") was implemented. Currently, the United States is one of a small group of World Trade Organization members which is a party to the GPA within the framework of the WTO, and that GPA became effective on January 1, 1996. The GPA seeks expansion of world trade in three main ways: 1. it prohibits discrimination based upon national origin for the procurement of goods and services from countries that are parties to the GPA, 2. it establishes clear and transparent laws, regulations and procedures for making government purchases, and 3. it applies competitive procedural requirements to the government purchasing and contracting process.
As noted above, the United States was a party to GATT, and it currently is a member of the WTO and a party to the Agreement on Government Procurement. Individual States may also elect to participate in the GPA, and thirty-seven States have agreed to do so. For purposes of the GPA, States are considered to be sub-central governments. Nebraska has participated in the GPA since at least 1993, when Governor Nelson agreed that the United States Trade Representative ("USTR") could offer procurement from the State's "central procurement agency" for coverage under the GATT Agreement on Government Procurement. Letter from E. Benjamin Nelson, Governor of Nebraska to Ambassador Michael Kantor, United States Trade Representative (December 10, 1993) (on file with the Office of the Governor of Nebraska).
In September 2003, Robert B. Zoellick, the United States Trade Representative, wrote to Governor Johanns and noted that the federal government was in the process of negotiating several new trade agreements with various countries. Letter from Robert B. Zoellick, United States Trade Representative to Mike Johanns, Governor of Nebraska (received by the Governor on September 15, 1993) (on file with the Office of the Governor of Nebraska). Mr. Zoellick then sought the Governor's permission to offer the new trading partners the same nondiscriminatory treatment that Nebraska already offered the 27 other countries which were members of the GPA. Id. Mr. Zoellick further represented that Nebraska would not be required to take on additional commitments which would require it to change its current government procurement practices. Id. Mr. Zoellick also stated that the new trade agreements would provide the same basic obligations as set out in the current GPA, and that, like the current GPA, the provisions would apply only to purchases of goods and services over $460,000, and to construction contracts over 6.481 million dollars. Id.
On May 10, 2004, Governor Johanns responded to Mr. Zoellick, and authorized him to offer access to Nebraska's government procurement market in the free trade agreements he was negotiating. Letter from Mike Johanns, Governor of Nebraska to Robert B. Zoellick, United States Trade Representative (May 10, 2004) (on file with the Office of the Governor of Nebraska). Governor Johanns stated that Nebraska would undertake the same commitments which it already had undertaken in the current GPA under the auspices of the World Trade Organization. Id. Governor Johanns also stated that:
 . . . Nebraska's agreement is contingent upon existing state laws that govern purchasing requirements for state agencies. Nothing in this correspondence abrogates existing state law.
Id.
You are concerned that the Governor may not have authority to bind the State of Nebraska to participate in the GPA and in the trade agreements which the USTR is currently negotiating. You also believe that the state's procurement laws are matters within the purview of the Legislature. Accordingly, you have posed two questions to us which we will discuss below. Both of your questions are posed in the context of proposed legislation which you are considering, and which would provide that "[s]tate officials, including the Governor, do not have the authority to agree to bind the State under the government procurement rules of an international trade agreement, nor to give consent to the federal government to be bound by such an agreement."
Question No. 1. Does the Governor have the authority to bind the state to the procurement provisions of those trade agreements the USTR is currently negotiating? If the Governor does not, in fact, have such authority, I question whether it is necessary to spell this out in state statute, as I am proposing to do.
To answer your initial question, it seems to us that we must first determine if, in our view, current Nebraska statutes give the Governor the authority to subject certain government procurement in Nebraska to the procurement provisions of the GPA with respect to additional countries as requested by the USTR. If there is no such current statutory authority, then we must determine if the Governor has inherent constitutional authority to act unilaterally in that fashion.
 1. The Agreement on Government Procurement (GPA)
In analyzing the Governor's authority to subject government procurement in Nebraska to the provisions of the GPA, it is important to start with an understanding of precisely what the GPA requires its participants to do. Therefore, we will set out a summary of the significant GPA provisions as we understand them. These are general rules, to which there are often exceptions.
1. The GPA applies to government procurement of both goods and services, including construction services, above the following thresholds: $477,000 for purchases of goods and services, and 6.7 million dollars for construction contracts. Those thresholds are subject to frequent review and revision. With respect to state participants, each State may specify which specific agencies or departments are subject to the GPA and which types of procurement are covered. Each State may also make any exceptions to coverage or exclusions which it deems necessary.
2. Entities which are subject to the GPA, including participating States, are required to apply all laws, regulations, procedures, and practices regarding government procurement so that the providers of products and services from countries which are also parties to the Agreement are treated the same in every respect as domestic providers of products and services, and the same as each other. Therefore, no preferences for domestic suppliers or for one foreign supplier over another may be applied, unless the State has listed that particular procurement as an exception to coverage. In addition, discriminatory procurement laws can continue to be applied to government procurements which do not fall within the scope of the GPA, or to countries which are not covered under the GPA.
3. Technical specifications for products or services to be procured will not be prepared, adopted or applied with a view to or the effect of creating unnecessary obstacles to international trade.
4. "Tendering" (bidding) procedures for government procurement subject to the GPA must be conducted in a nondiscriminatory manner. The GPA contains provisions for open tendering procedures, selective tendering procedures and limited tendering procedures.
5. A notice of proposed procurement must be published for each intended procurement subject to the GPA. Bid documentation provided to suppliers must also contain specified information.
6. Procedures for qualifying suppliers may not discriminate among domestic suppliers and foreign suppliers.
7. Selection of providers for government procurement must be done in a fair and nondiscriminatory manner. Bids must normally be submitted in writing. Bid opening procedures must be conducted with regularity.
8. Entities subject to the GPA may not use offsets in the qualification and selection of suppliers, products or services, or in the evaluation of bids and the award of contracts. Offsets are defined in the GPA to include measures used to encourage local development or improve balance-of-payments accounts by means of domestic content, licensing of technology, investment requirements, counter-trade or similar requirements.
9. Entities subject to the GPA must publish notice of awards of contracts which are covered by the GPA.
10. Governments of unsuccessful bidders in connection with a procurement under the GPA may obtain additional information on the contract award so as to determine if the procurement was made fairly and impartially. Parties to the GPA must promptly publish laws, regulations, judicial decisions, or administrative rulings of general application to government procurement covered by the GPA so that others can become acquainted with them.
11. Parties to the Agreement must provide nondiscriminatory, timely, transparent and effective procedures which will enable suppliers to challenge alleged breaches of the GPA arising in the context of procurements where they have or had an interest. An example of such a procedure would be providing access to a court system.
The provisions outlined above appear to fall into two main areas of emphasis. First, they require that government procurement subject to the GPA be nondiscriminatory, and that all suppliers be treated the same, without preferences. Second, they require that government procurement subject to the GPA be accomplished through open and competitive bidding and contract award procedures.
It is also important to understand which Nebraska agencies are bound by the actions of Governor Nelson and Governor Johanns, since the GPA applies only to government procurement by those specific agencies or departments which a particular State has designated as subject to the Agreement. Unfortunately, that determination is not entirely clear.
In Governor Nelson's 1993 letter to the USTR, he specified that procurement from Nebraska's "central procurement agency" could be offered under the GATT Agreement on Government Procurement.[1] Letter from E. Benjamin Nelson, Governor of Nebraska to Ambassador Michael Kantor, United States Trade Representative (December 10, 1993) (on file with the Office of the Governor of Nebraska). That designation could logically apply to the Department of Administrative Services ("DAS") and all of its procurement divisions such as the Materiel Division or the State Building Division. However, some materials pertaining to the GPA indicate that the only Nebraska procurement agency subject to the GPA is the Materiel Division of the Department of Administrative Services. LINDA CARROLL, WORLD TRADE ORGANIZATION GOVERNMENT PROCUREMENT AGREEMENT IMPLEMENTATION GUIDELINES AND DIRECTORY OF SOLICITATION ADVERTISING, Appendix A 17 (National Association of State Purchasing Officials 1996). In either case, it appears to us that application of the GPA in Nebraska extends only to portions of DAS under the Governor's direct control.[2]
 2. Statutory authority of the Governor with respect to the GPA.
We are aware of no Nebraska statute which specifically provides that the Governor has authority to subject certain government procurement in Nebraska to trade agreements similar to the GPA. Nor have we discovered any Nebraska cases which deal directly with that issue. However, there is a Nebraska statute which speaks to bidding preferences and nondiscriminatory bidding, the first area of emphasis under the GPA. There are also Nebraska statutes which deal with the authority of DAS and its divisions to purchase goods and services within an open and competitive bidding and procurement process, the second emphasis of the GPA.
In the area of nondiscriminatory treatment, Neb. Rev. Stat. §73-101.01 (2003) provides:
 When a public contract is to be awarded to the lowest responsible bidder, a resident bidder shall be allowed a preference over a nonresident bidder from a state which gives or requires a preference to bidders from that state. The preference shall be equal to the preference given or required by the state of the nonresident bidder. Resident bidder as used in sections 73-101.01 and 73-101.02 shall mean any person, partnership, foreign or domestic limited liability company, association or foreign or domestic corporation authorized to engage in business in the State of Nebraska and which has met the residency requirement of the state of the nonresident bidder necessary for receiving the benefit of that state's preference law on the date when any bid for a public contract is first advertised or announced or has had a bona fide establishment for doing business within this state for the length of time on the date when any bid for a public contract is first advertised or announced. Any contract entered into without compliance with sections 73-101.01 and 73-1-1/02 shall be null and void.
Therefore, Nebraska has a reciprocal preference statute. The State must give resident bidders in a particular public contracting situation the same preference which any nonresident bidders receive from their government in similar situations.
Under the GPA, suppliers or bidders for government procurement can receive no preferences. As a result, foreign countries which are parties to the GPA can give their own suppliers no preferences over Nebraska bidders in their government procurement subject to the Agreement. Consequently, since there can be no foreign preferences under the GPA, no preferences for resident bidders in Nebraska are required for government procurement under the GPA by § 73-101.01. On that basis, it appears to us that the nondiscriminatory preference provisions in the GPA are permissible under and compatible with Nebraska law.
The second area of emphasis within the GPA involves requirements for open and competitive bidding and contract award procedures. Nebraska statutory law in this area generally tracks the GPA, and provides broad authority for DAS and its divisions to make purchases of goods and services in an open and competitive environment.
The GPA applies to government procurement of goods and services, including construction services. It also covers procurement by any contractual means including lease, rental or hire purchasing. The Materiel Division of the Department of Administrative Services has broad authority in those areas. For example, Neb. Rev. Stat. § 81-153 (2003) provides, as is pertinent:
The material division shall have the power and duty to:
 (1) Purchase or contract for, in the name of the state, the personal property required by using agencies and the state;
 (2) Promulgate, apply and enforce standard specifications established as provided in section 81-154;
* * *
 (4) Determine the utility, quality, fitness, and suitability of all personal property tendered or furnished;
 (5) Make rules and regulations consistent with sections 81-145 to 81-171 and 81-1118 to 81-1118.06. . . .
* * *
 (8) Enter into any personal property lease agreement when it appears to be in the best interest of the state; and
 (9) Negotiate purchases and contracts when conditions exist to defeat the purpose and principles of public competitive bidding.
In addition, Neb. Rev. Stat. § 81-1118 (Supp. 2003) provides, in pertinent part:
 The materiel division of the Division of Administrative Services is hereby established and shall be managed by the materiel administrator.
There are hereby established the following seven branches of the materiel division of the Department of Administrative Services which shall have the following duties, powers and responsibilities:
* * *
 (5) The state purchasing bureau shall be responsible for all purchases by all state agencies other than the University of Nebraska. The materiel division shall administer the public notice and bidding procedures and any other areas designated by the Director of Administrative Services to carry out the lease or purchase of personal property.
* * *
Therefore, the Materiel Division of DAS has broad authority in the procurement of goods and personal property for the State.
In addition, the Material Division of DAS has broad authority in the procurement of services for the State. Neb. Rev. Stat. § 73-504 (2003) provides:
Except as provided in section 73-507 [containing certain exceptions]:
 (1) All state agencies shall comply with the review and competitive bidding processes provided in this section for contracts for services. Unless otherwise exempt, no state agency shall expend funds for contracts for services without complying with this section;
 (2) All proposed state agency contracts for services in excess of fifty thousand dollars shall be bid in the manner prescribed by the materiel division procurement manual or a process approved by the Director of Administrative Services. Bidding may be performed at the state agency level or by the materiel division. Any state agency may request that the materiel division conduct the competitive bidding process;
 (3) If the bidding process is at the state agency level, then state agency directors shall ensure that the bid documents for each contract for services in excess of fifty thousand dollars are prereviewed by the materiel division and that any changes to the proposed contract that differ from the bid documents in the proposed contract for services are reviewed by the materiel division before signature by the parties;
 (4) State agency directors, in cooperation with the materiel division, shall be responsible for appropriate public notice of an impending contractual services project in excess of fifty thousand dollars in accordance with the materiel division's procurement manual and sections 73-501
to 73-509; and
 (5) State agency directors, in cooperation with the materiel division, shall be responsible for ensuring that a request for contractual services in excess of fifty thousand dollars is filed with the materiel division for dissemination or web site access to vendors interested in competing for contracts for services.
To the extent that construction services are within Nebraska's coverage under the GPA,[3] the DAS Building Division also has authority with respect to government procurement in that area. For example, Neb. Rev. Stat. § 81-1108.15 (1999) provides, in part, that:
The [DAS Building] division shall have the primary functions and responsibilities of statewide facilities planning, facilities construction, and facilities administration and shall adopt and promulgate rules and regulations to carry out this section.
Nebraska statutes also require DAS and its procurement divisions to purchase goods and services through competitive bids and in an open and competitive environment. An example of such requirements is Neb. Rev. Stat. § 81-161 (2003), which states, as is pertinent:
 All purchases, leases, or contracts which by law are required to be based on competitive bids shall be made to the lowest responsible bidder, taking into consideration the best interests of the state, the quality or performance of the personal property proposed to be supplied, the conformity with specifications, the purposes for which required, and the times of delivery.
See also, Neb. Rev. Stat. § 81-1118 (Supp. 2003); Neb. Rev. Stat. § 72-803
(2003).
On the basis of the lengthy discussion above, it appears to us that the GPA, as applied to government procurement in Nebraska by Governors Nelson and Johanns, is consistent and compatible with existing Nebraska law. Moreover, by agreeing to require Nebraska's central procurement agency to conduct certain government procurements in accordance with the GPA, Governor Johanns essentially agreed that a state agency under his direction and control would perform tasks which it was already authorized to do in a manner consistent with its statutory authority. We believe that the Governor has the ability to act in that fashion, even absent some specific directive to join in the GPA.[4] It is also apparent that neither Governor Nelson nor Governor Johanns signed an actual treaty with foreign governments which would require the State of Nebraska to follow new procurement practices. Such an action by the Governor might well raise questions concerning improper exercise of legislative authority. Instead, both governors simply agreed to conduct certain government procurements in Nebraska in conformance with the GPA, and in a manner consistent with existing statutory authority for agencies under their control. For those reasons, we believe that current Nebraska statutes do allow the Governor to join the State in the GPA procurement provisions of those trade agreements which the USTR is currently negotiating. If you wish a contrary result, then you should go forward with the legislation proposed in your opinion request.
Question No. 2. What effect would the Governor's "consent" have if he did not, in fact, possess such authority? If the Governor does not have such authority, or, alternatively, if the Legislature passes a bill invalidating a past attempt by a state official to bind the State to trade agreements, I am concerned as to the effect this would have at the national level.
Since we have determined that the Governor does have authority to consent to application of the GPA to certain government procurements in Nebraska, it is not necessary for us to respond to the initial portion of your second question. However, given the proposed legislation set out in your opinion request and your concern about effects of state legislation at the national level, we will briefly comment on the second portion of your question.
Withdrawals of entities from the GPA and resultant modifications of GPA coverage are subject to Article XXIV of the Agreement. As we understand it, the United States government, at Nebraska's request, could withdraw coverage of Nebraska's government procurement from the GPA at any time. However, if that were to happen, then several consequences would flow from that withdrawal. First of all, the value of Nebraska's government procurement subject to the GPA would be calculated. Then, compensatory adjustments would quite likely be made to maintain a balance of rights and obligations and a comparable level of mutually agreed coverage under the Agreement. For example, other countries which are parties to the GPA could withdraw a like amount of their procurement from the GPA, which would mean that suppliers from Nebraska and other U.S. suppliers could lose some right to equal treatment regarding government procurement in other countries. Alternatively, compensatory adjustments might include a requirement that the federal government, as a party to the GPA and a member of the WTO, be required to make up the value of the Nebraska procurement lost in some fashion. Consequently, withdrawal of Nebraska's government procurement from application of the GPA could have adverse effects, both at the state and national levels.
Sincerely yours,
 JON BRUNING Attorney General
 Dale A. Comer Assistant Attorney General
Approved by:
__________________________________ Attorney General
cc: Patrick O'Donnell Clerk of the Legislature
[1] Apparently, Governor Nelson's 1993 letter also forms the basis for Nebraska's current participation in the GPA under the auspices of the WTO. Governor's Johann's letter of May 10 would simply extend that coverage to additional countries.
[2] We understand that it is likely that the USTR would defend whatever interpretation the Governor would place on the term "central procurement agency" for purposes of coverage under the GPA.
[3] The scope of coverage for a given entity under the GPA is determined both by the Agreement and by the coverage designation of the entity itself. As noted above, Nebraska has designated its "central procurement agency" as subject to the GPA. If that designation pertains to the Materiel Division alone, that agency has no authority to supervise the erection or construction of buildings under Neb. Rev. Stat. § 81-146
(2003). However, to the extent that Nebraska's designation includes the Building Division of DAS, that agency has authority regarding the construction of buildings.
[4] Indeed, we believe that the Governor could direct state purchasing agencies to make government procurements under the same terms as those set out in the GPA, even if the GPA did not exist, so long as countries of non-resident bidders did not establish preferences for their residents in government procurement.